UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Amanda R. Dickinson,

      Plaintiff,    **MEMORANDUM OPINION**
              **AND ORDER**
vs.              Civil No. 07-3346 ADM/RLE

St. Cloud Hospital, a Minnesota
non-profit corporation,

      Defendant.

___

Michael L Puklich, Esq., Neaton & Puklich, PLLP, Chanhassen, MN and Martin B. Ho, Esq., Stingley & Ho, PLLP, Minneapolis, MN appeared for and on behalf of the Plaintiff.

John L. Greer, Esq., and Kevin J. Hughes, Esq., Hughes Mathews, P.A., St. Cloud, MN appeared for and on behalf of the Defendant.

___

## I.  INTRODUCTION

On August 27, 2008, the undersigned United States District Judge heard oral argument on Defendant St. Cloud Hospital's ("SCH") Motion for Summary Judgment [Docket No. 20]. In her Amended Complaint [Docket No. 8], Plaintiff Amanda Dickinson ("Dickinson") alleges that SCH interfered and retaliated in violation of her rights under the Family Medical Leave Act ("FMLA"). For the reasons set forth below, SCH's Motion for Summary Judgment is denied on the interference claim and granted on the retaliation claim.

## II. BACKGROUND[1]

SCH is a regional 489-bed acute care inpatient and outpatient hospital located in St.

---

[1]On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

Cloud, Minnesota. Sakariason Aff. [Docket No. 24] ¶ 3. It is a Catholic, non-profit corporation operating within the CentraCare Health system. Id. SCH employs over 4,300 people in both full-time and part-time capacities and is an equal opportunity employer. Id. at ¶ 4.

Dickinson is a licensed practical nurse ("LPN") who was hired by SCH in February 2000. Greer Aff. Ex. 6 [Docket No. 23], (Dickinson Depo.) at 7, 10. In February 2001, she began working in SCH's Emergency Trauma Center ("ETC") as an ETC technician, and she worked there until her termination in May 2006. Id. at 10. Her duties included patient care, administering IV's, transporting patients, distributing medication, and other tasks assigned by physicians. Id. at 11. Her supervisor in the ETC was Paul Schoenberg ("Schoenberg") who is responsible for the operations of the ETC and supervises approximately 110 people in that department. Greer Aff. Ex. 4 (Schoenberg Depo.) at 5-6.

SCH maintains policies regarding employee attendance, including separate provisions for FMLA and non-FMLA qualifying absences. Greer Aff. Ex. 1, (St. Cloud Hospital's Approved/Unapproved Absences Policy); Greer Aff. Ex. 2, (CentraCare Health System/St. Cloud Hospital's Family/Medical Leave Policy). Under the policies, non-FMLA absenteeism rates exceeding 4% are cause for the supervisor to review the employee's attendance record to determine if counseling or disciplinary action is necessary. St. Cloud Hospital's Approved/Unapproved Absences Policy; Schoenberg Depo. at 11; Greer Aff. Ex. 5, (Sakariason Depo.) at 9. The absenteeism rate is not calculated by use of a specified time period because each employee works a different schedule. Sakariason Aff. ¶ 5. Instead, an employee's absenteeism rate is calculated by dividing the number of hours an employee is absent by the scheduled hours of the employee. Sakariason Depo. at 11-12. Certain types of absences,

including FMLA leave, are not factored into the absenteeism rate. Puklich Aff. Ex. A [Docket No. 31], (Campbell Depo.) at 22. Each supervisor is responsible for applying this policy in his department with occasional support from Human Resources. Sakariason Depo. at 26-27. Excessive absenteeism is subject to progressive levels of discipline including oral warnings, written warnings, suspension, probation, and termination. CentraCare Health System/St. Cloud Hospital's Disciplinary Policy.

Over the course of her employment at SCH, Dickinson progressed through these discipline levels because of her excessive non-FMLA absenteeism rates. She first received an oral warning on January 22, 2003. Dickinson Depo. at 89. She received a written warning on May 16, 2003 for an absenteeism rate of 13.59% non-FMLA sick time for the period of January through March 2003. Id. at 53-55, 89-90. SCH issued Dickinson a second written warning on October 27, 2003 for an absenteeism rate of 17.81% non-FMLA sick time from July through September 2003. Id. 56-58, 90. On June 10, 2004, Dickinson was disciplined by being placed on probation because of an absenteeism rate of 27% non-FMLA sick time during a four week period in May 2004. Id. at 87-88. During the first quarter of 2005, Dickinson had an absenteeism rate of 8.96% resulting in a written warning and a suspension from work. Schoenberg Depo. Ex. 2. In 2005, Dickinson began to take intermittent FMLA leave due to kidney stones. Id. at 177. SCH allowed her to take this leave by calling the hospital and informing the on-call scheduler that she had a kidney stone, and the on-call scheduler would then credit the absence as FMLA approved. Id. at 177-78.

After the 2005 suspension, Dickinson's absenteeism rate improved. Through the second and third quarters of 2005, her absenteeism rate fell below the 4% threshold. Schoenberg Depo.

3

Ex. 2.  On November 8, 2005, Dickinson became sick with the flu and missed one day of work.  Dickinson Depo. at 183.  This absence was her only non-FMLA absence for the fourth quarter of 2005.  Schoenberg Depo. Ex. 2.  She did take FMLA leave on November 22, 23, and 29, and she also took FMLA leave on December 2 although it appears that SCH only recorded seven hours of FMLA time instead of twelve hours for a full shift.  Id.

On December 13, 2005, Schoenberg spoke to personnel in the Human Resources department about Dickinson's absenteeism rate because of his concern regarding her absences.  Puklich Aff. [Docket No. 33] Ex. A (Ex. 1).  On December 30, 2005, Dickinson received a generally good performance evaluation, but it was noted that, "Amanda needs to work on attendance, other co-workers are getting burned out because Amanda can't be counted on to come to work."  Dickinson Depo. at 116.  Dickinson asserts that this comment was added to the form after she signed the evaluation.  Id. at 118.

On January 18, 2006, Dickinson reported to work, but left early after experiencing a kidney stone.  Dickinson Aff. [Docket No. 27] ¶ 2.  She reported her condition to the charge nurse on duty and followed up with a phone call to the scheduler the next day as she had been instructed to do by SCH.  Id. at ¶¶ 2, 3.  Dickinson's final two absences for the first quarter of 2006 occurred on February 21, 2006 and March 23, 2006 when she visited her uncle who had been electrocuted and was hospitalized with serious medical issues.  Dickinson Depo. at 185.  In both instances, Dickinson asked Schoenberg for permission to take leave to care for her uncle and was told it would not affect her employment.  Dickinson Aff. ¶ 5.  Schoenberg does not recall this specific conversation but agrees that if permission was given, these absences should not count against Dickinson.  Schoenberg Depo. at 53, 56-58.

Dickinson had no further non-FMLA absences until the date of her termination on May 9, 2006. She did, however, take intermittent FMLA leave for kidney stones and full FMLA leave from April 8, 2006 until May 6, 2006 for removal of a cyst in her breast. Dickinson Depo. at 124, 130, 186. During her leave time, emails between Schoenberg and personnel in Human Resources document inquiries by Schoenberg as to Dickinson's FMLA and non-FMLA leave and whether her absenteeism rate was above the 4% threshold. Schoenberg Depo. Ex. 2. Dickinson returned prepared to work at SCH on May 9, 2006, but met with Schoenberg prior to the shift. Dickinson Depo. at 132. At this meeting, Schoenberg told Dickinson that she was being terminated due to an absenteeism rate above the 4% limit. Id. at 134. The official Corrective Action Form describes the reason for her discharge as a "Non-FMLA absenteeism rate of 7.12% from November 6, 2005 to March 25, 2006, above the 4% hospital standard." Schoenberg Depo. Ex. 1.

### III. DISCUSSION

Dickinson alleges that SCH violated FMLA, 29 U.S.C. §§ 2601-2654, by interfering with her right to exercise qualified leave under the act. She also alleges that SCH retaliated against her by terminating her employment for exercising those rights protected under FMLA.

**A.    Standard for Summary Judgment**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.     FMLA**

The FMLA provides eligible employees up to 12 work weeks of unpaid leave during any 12-month period.[2] 29 U.S.C. § 2612. Employees may take FMLA leave for, inter alia, giving birth, caring for a newborn, or because a serious health condition makes the employee unable to perform the employee's job functions. Id. (a)(1). An employee must provide notice to an employer that she plans to take FMLA leave. 29 U.S.C. § 2612(e)(2). The statute contains two provisions that protect an employee from discrimination based on her exercise of rights guaranteed by the FMLA. See 29 U.S.C. §§ 2615(a)(1) & (2). The first refers to "interference" or (a)(1) claims, in which an employee asserts an employer denied or otherwise interfered with her substantive rights under the FMLA. 29 U.S.C. § 2615(a)(1). The second concerns "retaliation" or (a)(2) claims, which protects an employee from discrimination for exercising those rights. 29 U.S.C. § 2615(a)(2). See also Stallings v. Hussman Corp., 447 F.3d 1041, 1050 (8th Cir. 2006).

---

[2] An employee is eligible for FMLA leave if she "has been employed – (i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). The parties do not dispute that Dickinson is an eligible employee.

### 1. Interference

Section 2615(a)(1) makes it "unlawful for any employer to interfere with, restrain or deny the exercise of or the attempt to exercise, any right provided under this title." The regulation interpreting this provision provides, "[e]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R.§ 825.220(c); see also 29 U.S.C. § 2615(a)(1). "Interference includes 'not only refusing to authorize FMLA leave, but discouraging an employee from using such leave. It would also include manipulation by a covered employer to avoid responsibilities under FMLA.'" Stallings, 447 F.3d at 1050 (quoting 29 C.F.R. § 825.220(b)). An interference claim requires only proof that the employer denied an entitlement under FMLA and does not require a showing of intent. Stallings, 447 F.3d at 1051. Once such an entitlement is shown, an employer can avoid liability only by showing it would have made the same contested decision even if the employee had not exercised her FMLA rights. Throneberry v. McGehee Desha County Hosp., 403 F.3d 972, 979-80 (8th Cir. 2005). FMLA creates a right both to use a specified amount of leave for protected reasons and a right to return to one's job or an equivalent job after using the protected leave. 29 U.S.C. §§ 2612(a), 2614(a).

Dickinson asserts two theories of interference by SCH with her FMLA rights. The first is that SCH calculated an absenteeism rate in a manner that violated FMLA and the second is that SCH did not restore her to her prior position or an equivalent position after her FMLA leave. To support her contention that SCH used an improper absenteeism calculation, Dickinson relies on a Department of Labor regulation that states, "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor

can FMLA leave be counted under 'no fault' attendance policies." 29 C.F.R. § 825.220(c). Dickinson argues that FMLA leave must be included in the denominator of the absenteeism calculation because failing to do so causes the negative effect of increasing her absenteeism rate. SCH argues that it does not violate the regulation because it treats FMLA leave neutrally by excluding it from both the numerator and the denominator.

To the Court's knowledge, the issue of whether to include FMLA leave in an absenteeism calculation has been raised in only two other courts which adopted opposite conclusions. Both cases involved the attendance policy of Federal Express Corp. ("FedEx"). See Payton v. Federal Express Corp., No. 1:06-CV-00333, 2006 WL 2715163 at *4-5, (M.D.Pa. Sept. 22, 2006); Keasey v. Federal Express Corp., No. 03-228 slip op. at *5 (W.D.Mich. Dec. 9, 2003). FedEx required its employees to attend work at least 96.92% of the eligible days within a twelve-month period. Payton, 2006 WL 2715163, at *1. If the employee's attendance rate did not meet the 96.92% standard, he could be disciplined. Id. After three written disciplinary actions within twelve months, he was subject to termination. Id. In both cases, the plaintiff was discharged for failing to meet the attendance rate. Id.; Keasey, No. 03-228 at 2. Also in both cases, FedEx did not include the plaintiffs' FMLA leave in either the numerator or the denominator, and the plaintiffs argued that this resulted in an FMLA violation. Keasey, No. 03-228 at *3; Payton, 2006 WL 2715163 at *1.

In Keasey, the court found that FedEx's calculation of the attendance rate did not violate FMLA. The court reasoned that including the plaintiff's FMLA leave in the rate would essentially give him 100% attendance for a period in which he did not work. Keasey, No. 03-228 at *5. It likened this outcome to giving the employee a benefit; something not required

under FMLA. Id. To support this finding, the court cited Sawyer v. Ball Corp., No. 4:96-CV-168, 1997 U.S. Dist. LEXIS 23614 at *9 (E.D.Va. 1997) in which the court held that an employee's probationary status is frozen while on FMLA leave. "Otherwise the employee 'would be relieved of his obligation to demonstrate acceptable attendance over the period [the employer] designated. The FMLA does not mandate such a windfall for employees.'" Keasey, No. 03-228 at *5 (quoting Sawyer v. Ball Corp., 1997 U.S. Dist. LEXIS 23614 at *9) (alteration in original).

The Payton court disagreed with the Keasey analysis. It reasoned that by subtracting thirty days from the denominator of the rate without adjusting the numerator accordingly, FedEx reduced the number of "no-fault" attendance days available to Payton. Payton, 2006 WL 2715163, at *4 (citing 29 C.F.R. § 825.220(c)). It therefore distinguished this situation from Sawyer "because the employee's probationary status was suspended during his FMLA leave, whereas Payton's FMLA leave was deducted against his attendance." Id. The court analogized to a situation in which an employee entitled to eight no-fault attendance days was only allowed seven no-fault days after taking FMLA leave and found this would be a clear violation of FMLA. Id. The effect of taking FMLA leave is to reduce the number of non-FMLA leave days an employee could take.

The Court finds the reasoning of the Payton court more persuasive. SCH's argument that it does not factor FMLA leave in any way in calculating the attendance rate may be mathematically true, but the practical consequence of this method is that the taking of FMLA leave becomes a negative factor. Application of the actual numbers illustrates the issue. As a ".9" employee, Dickinson was scheduled to work 1,872 hours per year. Schoenberg Depo. at 14.

9

To remain below the 4% absenteeism rate required by SCH, she could only miss 74.88 hours of work a year (74.88 ÷ 1872 = 4%). Applying the method by which SCH calculates the absenteeism rate means that if Dickinson takes 100 hours of FMLA leave as well as 74.88 hours of non FMLA leave, her absenteeism rate rises above 4% (74.88 ÷ 1772 = 4.22%). By virtue of the fact that a SCH employee elects to take FMLA leave, the employee is allowed fewer non-FMLA absences, which results in a negative factor for purposes of an employment action. 29 C.F.R. § 825.220(c).

This determination, however, does not end the inquiry. SCH can still prevail if it can show that it would have terminated Dickinson even if she had not exercised her FMLA rights. See Throneberry, 403 F.3d at 979-80. To do so, SCH would need to demonstrate that Dickinson's absenteeism rate would be above 4% over the time period used to determine that rate even with the FMLA leave factored into the denominator. The parties present different calculations of what the denominator should be based on both the number of FMLA hours included in the denominator and the time period over which the rate is calculated. For the fourth quarter of 2005, SCH calculates Dickinson's absenteeism rate at 4.53%. Schoenberg Depo. Ex. 2. Dickinson argues that intermittent FMLA leave taken in November and December 2005 should be included in the calculation, thus lowering her absenteeism rate to 3.92%; below the 4% threshold. Pl.'s Mem. in Opp'n to Summ. J. at 9 [Docket No. 26]. To the extent the parties disagree as to these precise numbers and the weight Schoenberg gave to the fourth quarter absenteeism rate in making his decision to terminate Dickinson, a fact finder could determine that SCH would not have terminated Dickinson had she not taken FMLA leave.

The parties also differ on the absenteeism rate calculation for the entire period from

November 6, 2005 to March 25, 2006. SCH argues that the denominator should be either 661.69 or 673.69 hours for this time period.[3] Dickinson believes that the number should be 738.69 hours based on the inclusion of the January 18, 2006 FMLA absence as well as intermittent FMLA leave taken by Dickinson in November and December. But even using Dickinson's proposed figures, the calculation yields an absenteeism rate higher than 4% when divided by the 36 hours for the three non-FMLA absences (4.9%).

Dickinson argues, however, that the absences of February 21, 2006 and March 23, 2006 should not be counted against her because Schoenberg gave her permission to miss those days and told her she would not be penalized for taking them. Dickinson argues that the doctrine of equitable estoppel has been applied in similar situations. See Duty v. Norton-Alcoa Proppants, 293 F.3d 481 (8th Cir. 2002); Podkovich v. Glazer's Distributors of Iowa, Inc., 446 F. Supp. 2d 982 (N.D. Iowa 2006);and Woodford v. Cmty. Action of Greene Co., Inc., 268 F.3d 51 (2d Cir. 2001). However, the doctrine of equitable estoppel has been applied in these FMLA cases only to the extent that an employer represented to an employee that she was not eligible or need not take FMLA leave. Dickinson does not claim that circumstance here. However, to the extent that Schoenberg admitted that had he told Dickinson she could take those days off and that the absences should not have been counted against her, a question of fact has been created. Although it requires a large confluence of mathematical gymnastics and favorable inferences regarding how much Schoenberg relied on the fourth quarter numbers and whether he gave Dickinson permission to take the February and March 2006 non-FMLA leave, the evidence

---

[3] SCH argues that the total should be 661.69 hours, but the inclusion of the January 18, 2006 absence as FMLA leave would raise this number to 673.69.

taken in the light most favorable to Dickinson might lead a jury to conclude that SCH interfered with her rights under FMLA and that SCH would not have terminated her but for exercising those rights.

Dickinson also claims SCH interfered with her rights under FMLA by failing to restore her to her former or equivalent position. See 29 U.S.C. § 2614(a)(1)(A), (B); 29 C.F.R. § 825.214(a). She reasons that because SCH terminated her before she could return from the April 8, 2006 to May 6, 2006 FMLA leave, she was not restored to her former or equivalent position. SCH argues that she was returned to work but that even if she was not, she was terminated for a non-FMLA reason and therefore it did not interfere with her FMLA rights. To the extent that SCH had a legitimate non-FMLA reason for Dickinson's termination, it need not have reinstated her in her former or equivalent position. See Throneberry, 403 F.3d at 977; Bailey v. Armsted Indus., Inc., 172 F.3d 1041, 1045-46 (8th Cir. 1999). As stated above, however, fact issues remain regarding the mathematical formulae, the time period over which it was calculated, and whether Schoenberg gave Dickinson permission to be absent on February 21 and March 23. For these reasons, summary judgment is denied with respect to the interference claim.

**2. Retaliation**

Section 2615(a)(2) makes it "unlawful for any employer to discharge or in any manner discriminate against any individual for opposing any practice made unlawful by this subchapter." The Eighth Circuit has held "[t]his prohibition necessarily includes consideration of an employee's use of FMLA leave as a negative factor in an employment action." Darby v. Bratch, 287 F.3d 673, 679 (8th Cir. 2002). "An employee can prove FMLA retaliation circumstantially, using a variant of the burden shifting test established in McDonnell Douglas." McBurney v.

12

Steve Hansen's Dodge City, Inc., 398 F.3d 998, 1002 (8th Cir. 2005). Under the McDonnell Douglas framework, the plaintiff employee must initially establish a prima facie case of discrimination. This showing creates a presumption that the employer acted unlawfully. See Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1134-35 (8th Cir. 1999) (applying framework to Title VII claim). The burden of production then shifts to the employer to provide legitimate, non-discriminatory reasons for the adverse employment action. Id. If the defendant meets this requirement, the burden returns to the plaintiff to show that the employer's explanation is pretextual. Id.

SCH argues that Dickinson cannot establish a prima facie case but assuming *arguendo* she does, she cannot demonstrate that SCH's proffered reason for termination was pretextual. To establish a prima facie case of FMLA retaliation, an employee must show: (1) she exercised rights protected under the Act; (2) she suffered an adverse employment action; and (3) a causal connection existed between the employee's action and the adverse employment action. See Darby, 287 F.3d at 679. SCH does not dispute that Dickinson exercised rights under the Act and that she suffered an adverse employment action, but contests whether she can prove a causal connection between her taking of FMLA leave and the termination. The only evidence Dickinson presents on causal connection is the temporal proximity of the taking of her leave and the termination. She was fired the day she returned from FMLA leave.

The Eighth Circuit has held that "[g]enerally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." Kiel, 169 F.3d at 1136. However, when the timing between the protected activity and the adverse action is extremely close, courts have found that temporal proximity

13

alone is enough to establish a causal connection for purposes of a prima facie case.  See Smith v. Allen Health Systems, Inc., 302 F.3d 827, 833 (8th Cir. 2002) (two weeks); Sprenger v. Federal Home Loan Bank of Des Moines, 253 F.3d 1106, 1113-14 (8th Cir. 2001) (a matter of weeks); Hansen v. Mannheim Services Corp., 2006 WL 47315 (D.Minn. 2006) (on returning to work).  Given the close proximity here, Dickinson has established a prima facie case of retaliation under FMLA.

Having done so, the burden now shifts to SCH to demonstrate a non-discriminatory reason for Dickinson's termination, which it does by proffering her excessive non-FMLA absenteeism rate as the reason for her termination.  The burden shifts back to Dickinson to demonstrate that this reason is pretext.  Unlike the requirements to establish a prima facie case, temporal proximity alone is not enough to establish pretext.  See Sprenger, 253 F.3d 1114.  Therefore, Dickinson raises two additional facts to establish pretext.  The first is that Schoenberg used time periods other than a year to determine that Dickinson's non-FMLA absences exceeded 4%.  Dickinson presents no rationale as to why the 4% threshold must be measured annually.  A hospital needs to have qualified individuals working on every shift, and it follows that SCH supervisors might need the added flexibility of keeping track of absenteeism rates over shorter time periods.  The second fact Dickinson raises to support a finding of pretext is evidence that Schoenberg was tracking her absences and communicating with Human Resources concerning her FMLA and non-FMLA leave.  Dickinson had a history of non-FMLA absenteeism and had been disciplined repeatedly for this behavior.  A supervisor's decision to track the absenteeism rate of an employee in this situation is not discriminatory.  The communications between Schoenberg and Human Resources do not demonstrate an attempt to circumvent Dickinson's

FMLA rights, rather these communications show a supervisor attempting to ensure that SCH complied with the FMLA by clearly delineating between FMLA and non-FMLA absences. For these reasons, summary judgment is granted with respect to the retaliation claim.

## IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendant St. Cloud Hospital's Motion for Summary Judgment [Docket No. 20] is **DENIED** on the interference claim and **GRANTED** on the retaliation claim.

BY THE COURT:


    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  October 20, 2008.